IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KRISTINA ENGELBRECHT,                                    CV. 05-665-PK

               Plaintiff,

v.                                                       FINDINGS AND
                                                         RECOMMENDATION/
                                                         ORDER

CLACKAMAS COUNTY,

                Defendant.

PAPAK, Magistrate Judge:

       Plaintiff Kristina Engelbrecht ("Engelbrecht") is a former employee of the defendant

Clackamas County (the "County"). She brings this action under 42 U.S.C. § 1983, alleging that

the County violated her constitutional right to equal protection by treating her differently than

similarly situated employees in retaliation for exercising her bumping rights under a collective

bargaining agreement. Engelbrecht also alleges constructive wrongful discharge under Oregon

common law. This court has jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331

FINDINGS AND RECOMMENDATION/ORDER

and over the state claims pursuant to 28 U.S.C. § 1367.

The County has moved for summary judgment on all claims and to strike portions of Engelbrecht's declarations submitted in opposition to summary judgment.  Oral argument on these motions was heard on June 19, 2006.  For the reasons set forth below this court recommends that the County's Motion for Summary Judgment be granted as to Engelbrecht's § 1983 claim, and that supplemental jurisdiction be declined as to her wrongful discharge claim. The County's Motion to Strike is denied as moot.

## SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment as a matter of law if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact."  Fed. R. Civ. P. 56(c); Bahn v. NME Hospitals, Inc., 929 F.2d 1404, 1409 (9th Cir. 1991).  The substantive law governing a claim or defense determines whether a fact is material.  T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).  A "material fact" is one that is relevant to an element or a claim or defense, whose existence might affect the outcome of the case.  Id.

The moving party carries the initial burden of proof.  The party meets this burden by identifying portions of the record on file which demonstrate the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986).  Once the initial burden is satisfied, the burden shifts to the non-moving party to demonstrate through the production of probative evidence that there remains an issue of fact to be tried.  Id.

///

The court must view the evidence in the light most favorable to the non-moving party.

FINDINGS AND RECOMMENDATION/ORDER

Bell v. Cameron Meadows Land Co., 669 F.2d 1278, 1284 (9th Cir. 1982).  All reasonable doubt

as to the existence of a genuine issue of fact should be resolved against the moving party.

Hector v. Wiens, 533 F.2d 429, 432 (9th Cir. 1976).  The inferences drawn from the underlying

facts must be viewed in the light most favorable to the party opposing the motion.  Valadingham

v. Bojorquez, 866 F.2d 1135, 1137 (9th Cir. 1989).  Where different ultimate inferences may be

drawn, summary judgment is inappropriate.  Sankovich v. Ins. Co. of N. America., 638 F.2d 136,

140 (9th Cir. 1981).

 The Ninth Circuit has set a high standard for granting summary judgment in employment

discrimination cases.  Schindrig v. Columbia Machine, Inc., 80 F3d 1406, 1410 (9th Cir.), cert.

denied, 117 S. Ct. 295 (1996) (holding that courts should require very little evidence to survive

summary judgment in a discrimination case, because the ultimate question is one that can be

resolved only through a searching inquiry that is most appropriately conducted by the fact-finder,

upon a full record).

 However, deference to the non-moving party does have some limit.  The non-moving

party "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ.

P. 56(e).  Self-serving affidavits will not establish a genuine issue of material fact if they fail to

state facts based on personal knowledge or are too conclusory.  Rodriguez v. Airborne Express,

265 F.3d 890, 902 (9th Cir. 2001).  The "mere existence of a scintilla of evidence in support of

the [non-moving party's] position would be insufficient."  Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 252 (1986).  Therefore, where "the record taken as a whole could not lead a rational

trier of fact to find for the non-moving party, there is no genuine issue for trial."  Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

**FACTS**

Because all material facts must be viewed in the light most favorable to the non-movant, this court will view the evidence in the light most favorable to Engelbrecht. A review of the parties' submissions, including affidavits, declarations, deposition excerpts and exhibits reveals the following material facts.

From 2001 until April 2003, Engelbrecht worked as an Information and Referral (I&R) Specialist for the County's Social Services Division. In April 2003, after learning that she would be laid off, Engelbrecht exercised her right under the collective bargaining agreement between the County and the Clackamas County Employees Association ("CCEA") to "bump" into a position held by a less-senior employee in the Eligibility Unit. Engelbrecht joined the Eligibility Unit as an Eligibility Specialist on April 14, 2003. Three other employees also bumped into the position of Eligibility Specialist around the same time as Engelbrecht: Anna Jones, Kristina McNiece, and Jody Karlick. Together with Engelbrecht, this group of four was collectively referred to in the Eligibility Unit as "ducklings." At that time, Patricia Tran ("Tran") and Jean Harrison ("Harrison") were the lead workers in the Eligibility Unit and Sarah Ordway ("Ordway"), now Sarah Briggs, was the supervisor.

Even before the four employees started work in the Eligibility Unit, existing employees expressed concern about the need to train the new employees, and sorrow over the loss of colleagues displaced by the bumping. In March 2003, Ordway scheduled a meeting with the unit employees to discuss their concerns. After this meeting, Eligibility Unit staff continued to express resentment about the bumping, among themselves and to Engelbrecht and others who bumped into the unit. Engelbrecht claims that Harrison and another co-worker said things like, "I cannot believe they are allowing someone from I&R to bump into Eligibility," and "You are not qualified to be able to bump into an ES position." Engelbrecht alleges that these comments

were made at least daily and usually more than once per day until June 2003, when the comments began occurring weekly.

Before starting her new position, Engelbrecht discussed with Ordway her interest in working a flexible ("flex") schedule, which is an alternative schedule contemplated by the collective bargaining agreement. Ordway told Engelbrecht that she might consider approving a flex schedule after Engelbrecht had been in the unit for 90 days, had experience serving as the Daily Eligibility Worker ("DEW"), covered caseloads of absent coworkers, and demonstrated competence in handling her job responsibilities.

In June 2003, Engelbrecht emailed Ordway again requesting a flex schedule so that she could have two Fridays off per month to attend classes. Ordway denied her request, stating that she could not approve a flex schedule for Engelbrecht until her tardiness improved. Ordway told Engelbrecht she would be willing to revisit the issue of a flex schedule after 30 days if her attendance improved. Engelbrecht did not renew her request for a flex schedule. One of Engelbrecht's co-workers, Kristina McNiece, was granted a flex schedule six weeks after Engelbrecht's request was denied. According to Engelbrecht, in the months prior to McNiece's request she had also missed work frequently for doctor's appointments related to her pregnancy and her husband's illness.

In addition to general resentment towards the new employees, Engelbrecht alleges Eligiblity Unit coworkers were unresponsive to requests for assistance. Further, lead workers Tran and Harrison repeatedly expressed reluctance about training employees who bumped into the unit. Engelbrecht contends Ordway was also overheard expressing frustration to the lead workers about having to provide training to new employees. According to Engelbrecht, in April or May 2003, Tran acknowledged at a "duckling meeting" that the leads did not want to train

employees who bumped into the unit, in hopes that they would leave.

Engelbrecht reported to Ordway in April, May, June, and July 2003 that the leads were not providing training to the new employees and were treating them with hostility. On July 2, 2003, Ordway sent an email memo to Eligibility Unit employees regarding "negativity pollution." The memo was intended to address general functions about workload issues and other sources of stress for employees in the unit. Ordway did not address directly the issue of bumping or the treatment of new employees in the unit.

According to Engelbrecht, although Ordway indicated in her email that she would "strive to model the positive attitude and behavior" that she was asking of her subordinates, she conveyed a very different impression in private conversations with some of them. For example, Engelbrecht alleges that on one occasion, after a diversity training, Engelbrecht overheard Ordway remark that she felt as though she had to put duct tape over her mouth to ensure that she did not say anything offensive to anyone.

Engelbrecht contends that Ordway's July 2003 memo was a turning point after which the lead workers and coworkers targeted her to a greater degree than the other three women who had bumped into the unit. Co-workers Kristina McNiece and Anna Jones reported to Engelbrecht that workers continued to make hostile comments about her after the "negativity pollution" memo, outside of Engelbrecht's presence. In addition, Engelbrecht claims Tran and Harrison frequently questioned Engelbrecht's ability to do her job, and her coworkers complained about having to cover for her when she was absent. Engelbrecht missed work following a car accident in July and a second car accident in August, 2003. According to Engelbrecht, the staff did not complain in the same manner when McNiece was absent.

Engelbrecht claims that her co-workers and the leads would also comment whenever she

was away from her desk, implying that Engelbrecht was shirking her duties, even though it was common for eligibility specialists to be away from their desks. Engelbrecht states that co-workers told her on one occasion Ordway came by her desk while Engelbrecht was in a meeting and was very upset about Engelbrecht not being at her desk. Engelbrecht also claims that lead workers and certain co-workers would go through her desk and review her work when she was absent. On one occasion, Ordway made a copy of a form found on Engelbrecht's desk that indicated she had failed to recertify food stamps for a client.

In addition to criticism of her attendance and work performance, Engelbrecht alleges that her appearance was also frequently the subject of discussion among the leads and co-workers. She claims Tran and other Eligibility Unit workers and workers from other units expressed the view that Engelbrecht wore inappropriate and provocative attire to work.

As a result of this treatment, Engelbrecht allegedly began experiencing anxiety attacks at work in the summer of 2003. By the fall of 2003, Engelbrecht's co-workers observed her crying every day.

In September 2003, Engelbrecht met with Ordway to discuss errors in Engelbrecht's work, reported to Ordway by Harrison. Engelbrecht told Ordway she thought the leads and co-workers were trying to sabotage her by looking for errors in her work but refusing to train her. Engelbrecht told Ordway that since she had repeatedly sought Ordway's assistance in resolving her work problems to no avail she felt she had no other choice but to look for other employment. Around this same time, Mary Ann Hard, another county employee who sat next to Engelbrecht when Engelbrecht worked at the Information and Referral Unit, overheard Ordway remark to Tran and another co-worker, "So Kristy's unhappy and I suppose that I'm supposed to wave my magic wand and make her happy." Ordway also complained that Engelbrecht did not attend a

unit meeting Ordway had scheduled, and added sarcastically, "Isn't that always the way." Hard reported Ordway's remarks to her supervisor, Liz Bartell. Bartell subsequently reported Ordway's statements to Ordway's supervisor, John Mullin ("Mullin"), Director of the Social Services Division.

On September 15, 2003, Engelbrecht told CCEA Vice President Alison Deane ("Deane") that she had been harassed since bumping into the Eligibility Unit. Two days later, Hard reported to Deane the statements that she had heard Ordway make in the lunchroom regarding Engelbrecht. Deane recommended that Engelbrecht's concerns be reported to Mullin. In a meeting with Mullin on September 17, 2003, Deane relayed all that Engelbrecht had told her about the harassment she experienced and Ordway's failure to address the problem. Mullin indicated that he was aware that there was an issue regarding the leads failing to provide training.

On September 24, 2003, Deane filed a grievance on Engelbrecht's behalf, alleging that there were two occasions in which Ordway was overheard criticizing Engelbrecht in the lunch room. It also alleged that Engelbrecht was denied a flex schedule granted to others after she requested it. The grievance specified that two of Engelbrecht's rights had been violated as a result: (1) Article XI of the collective bargaining agreement, prohibiting breach of confidentiality and public embarrassment; and (2) Article XV, prohibiting an employee from being targeted for unfair and discriminatory treatment. Engelbrecht requested an immediate transfer within Social Services to a different work unit.

After the grievance was filed, Mullin met with Ordway and told her he expected that she would not be involved in a discussion about work-related issues, especially about personnel, in a common area. Ordway was required to respond to the grievance. In her response, Ordway

acknowledged that she participated in a lunchroom conversation with one of her leads and another staff member regarding Englebrecht's management of her caseload sometime between September 11, 2003 and September 15, 2003, and that the conversation was unacceptable under Article XI.  However, she pointed out that denial of a flex schedule was within her discretion as a manager and that Engelbrecht's association rights were not violated under Article XV because there was no specific allegation in her statement that related to discrimination based on age, sex, disability, marital status, race, color, creed, national origin, or political affiliation.  Lastly, Ordway stated that she did not believe a transfer was an appropriate remedy to the alleged violation and she understood that there was no position available in another unit of Social Services.

On October 6, 2003, Deane requested that Mullin review Ordway's response to the grievance as the next step in the grievance process.  Two days later, on October 8, 2003,  Deane provided Mullin with a handwritten clarification that Engelbrecht believed the harassment was due to her exercising her bumping rights.  Deane also provided Mullin with literature regarding "mobbing" and "bullying in the workplace."  The next day, Deane attached a further addendum to the grievance she sent to Mullin, requesting that Engelbrecht be allowed to move her work location to the third floor.

Mullin responded to the grievance through a memo in which he agreed that Ordway's lunchroom criticism of Engelbrecht violated Article XI, and that he had dealt with it by speaking with Ordway and having her talk to her leads.  Mullin disagreed that Article XV had been violated, for the same reasons that Ordway stated.  He also stated that Engelbrecht was needed in the unit, and there was no other position available in the agency.

///

On October 15, 2003, Deane met with Mullin and discussed Engelbrecht possibly moving to the third floor.  Mullin indicated that he did not think it was a good idea, because Engelbrecht would be more isolated and find it difficult to get training and technical assistance. Deane also reported to Mullin that Engelbrecht's co-workers had commented on the length of her skirt and that Ordway had called Engelbrecht at home to find out if she was attending the unit retreat at the home of a co-worker who had been hostile to her.

On October 20, 2003, Engelbrecht returned to work from medical leave and met with Mullin and CCEA Greivance Committee Co-Chair, Cheryl Nally ("Nally"), regarding her transition back to the workplace.  Engelbrecht told Mullin about the initial tension felt by all of the employees that bumped into the unit.  Engelbrecht then explained that the focus of the tension gradually went from the group of employees who had bumped into the unit to her in particular, and that Ordway had also joined the lead workers in their hostile treatment.  Mullin acknowledged that the lead workers had become a problem and stated that he would ask the leads to provide support to Engelbrecht.  Engelbrecht expressed concern that the situation was beyond Mullin's ability to resolve and asked to be moved out of the unit.  Her request was denied.

Between October 22, 2003 and October 27, 2003, Engelbrecht's grievance was passed on from Nally to Irene Fischer-Davidson ("Fischer-Davidson") the Director of Human Services. Fischer-Davidson concurred with Mullin and Ordway that the criticisms made in the lunchroom were inappropriate and were dealt with as a result, and that there had been no Article XV violation.  On October 29, 2003, Engelbrecht's grievance was sent to Nancy Drury ("Drury"), Director of Department of Employee Services.

During the month of November, Engelbrecht alleges that she received more hostile

treatment both from her co-workers and from Ordway.  According to Engelbrecht, hostile

treatment occurred in the form of Ordway's failure to secure a safe working environment by

refusing to intervene at Engelbrecht's request when a lay person whom Engelbrecht suspected to

be on drugs walked into the work area.  Also, earlier in the month, Engelbrecht alleges that a co-

worker loudly criticized her work on more than one occasion.

On November 21, 2003, Drury denied Engelbrecht's grievance.  In late December 2003,

Engelbrecht notified Ordway of her resignation.  Engelbrecht filed her complaint in this court on

May 10, 2005.

## DISCUSSION

**I.    <u>Section 1983 Equal Protection Violation</u>**

In her first claim for relief, Engelbrecht alleges that the County violated her constitutional

right to equal protection of the law by treating her differently than other similarly situated

employees in her workplace, without a rational basis, in retaliation for exercising her right under

the collective bargaining agreement to bump into the Eligibility Unit from her previous position.

42 U.S.C. § 1983 "creates a private right of action against individuals who, acting under color of

state law, violate federal constitutional or statutory rights."  The Equal Protection Clause of the

Fourteenth Amendment to the United States Constitution provides in part that "no state shall

make or enforce any law which shall . . . deny to any person within its jurisdiction equal

protection of the laws."

A municipality or county can be held liable under § 1983 if an unconstitutional act was

committed by a government actor pursuant to a custom or policy, of if that act was committed by

a final policymaker for the governmental entity.  <u>Jett v. Dallas Independent School District</u>, 491

U.S. 701 (1989); <u>Monell v. New York City Department of Social Services</u>, 436 U.S. 658 (1978).

There are four bases upon which a municipality or county can be held liable under § 1983: (1)

when an express policy causes a constitutional violation; (2) when a widespread practice,

although not authorized by written law or express municipal policy, is so pervasive and well

settled that it constitutes a custom or usage with the force of law; (3) when the constitutional

injury is caused by a person with final policymaking authority; or (4) when a final policymaker

ratifies a subordinate's actions and the basis for them.  <u>See</u> <u>Abbot v. Village of Winthrop Harbor</u>,

205 F.3d 976, 981 (7th Cir. 2000); <u>see also</u> <u>Lytle v. Carl</u>, 382 F.3d 978, 982 (9th Cir. 2004);

<u>Board of County Commissioners v. Brown</u>, 520 U.S. 397, 403 (1997)("a municipality may not

be held liable under § 1983 solely because it employs a tortfeasor").

> **A.      Underlying Constitutional Violation**

A municipality cannot be held liable under § 1983 in the absence of an underlying

constitutional violation.  <u>City of Los Angeles v. Heller</u>, 475 U.S. 796 (1986).  In this case,

Engelbrecht does not allege that she was denied a fundamental right, or that she is a member of a

protected class.  Instead, she argues that she is a class of one and that she has been intentionally

treated differently from other similarly situated County employees for no rational reason.

Specifically, Engelbrecht alleges the following acts of disparate treatment: (1) resentment

from co-workers and lead workers, engendered by Engelbrecht bumping into the Eligibility Unit;

(2) critical comments about her work and appearance from co-workers and lead workers; (3) two

comments from supervisor Ordway about Engelbrecht being unhappy; (4) denial of a flex

schedule; and (5) denial of her request to relocate her work station to another floor.

According to the County, a "class of one" theory should not be applied in the

employment context, and in any event Engelbrecht has not shown a class of similarly situated

persons compared to whom she was singled out.  The County also disputes Engelbrecht's claim

that she was treated unequally since the co-workers she compares herself to claim to have

experienced treatment similar to the treatment complained of by Engelbrecht.

  **i.  Class of One**

  The Equal Protection Clause protects a "class of one" when a plaintiff can show that she

has been intentionally treated differently than others similarly situated and there is no rational

basis for the different treatment.  <u>SeaRiver Mar. Fin. Holdings, Inc. v. Mineta</u>, 309 F.3d 662, 679

(9th Cir.2002).  The number of individuals in a class is of no consequence for the equal

protection analysis, although "[c]lassifications should be scrutinized more carefully the smaller

and more vulnerable the class is [and a] class of one is likely to be the most vulnerable of all."

<u>Esmail v. Macrane</u>, 53 F.3d 176, 180 (7th Cir.1995); <u>see also</u> <u>Squaw Valley Dev. Co. v.</u>

<u>Goldberg,</u> 375 F.3d 936, 944 (9th Cir. 2004) (Equal Protection Clause protects not only groups,

but individuals who would constitute a "class of one").

  The County contends Engelbrecht's "class of one" theory cannot be maintained because

the Supreme Court in <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562, 564 (2000) (per curiam),

did not intend to expand the theory beyond the regulatory context.  In <u>Olech</u>, a property owner

alleged that the city violated her equal protection rights when it conditioned her connection to a

municipal water supply upon the granting of an easement.  <u>Id.</u> at 563.  Olech asserted that the

city's discriminatory behavior was irrational and wholly arbitrary and motivated by ill will.  The

district court dismissed the lawsuit for failure to state a cognizable claim.  The Court of Appeals

for the Seventh Circuit reversed and the Supreme Court affirmed, holding that the Equal

Protection Clause *does* protect a cause of action on behalf of a "class of one" where the plaintiff

does not allege membership in a class or group.  Id. at 563-64.

However, in Lauth v. McCollum, 424 F.3d 631, 633 (7th Cir. 2005), Judge Posner expressed strong doubt about the efficacy of a "class of one" theory in the employment context.[1] Without holding that a public employee could never bring a "class of one" claim, the Lauth court emphasized that for a plaintiff to prevail under this theory she must "negative any reasonably conceivable state of facts that could provide a rational basis for the [alleged unequal treatment]." Id. (citing Board of Trustees v. Garrett, 531 U.S. 356, 367 (2001) and Lamers Dairy, Inc. v. U.S. Dept. of Agriculture, 379 F.3d 466, 473 (7th Cir. 2004)).  The plaintiff in Lauth could not do this, let alone identify any other police officer who, despite being similarly situated, was deliberately treated differently.  424 F.3d at 634.

The Lauth court stated that it was "not surprised to have found no 'class of one' cases in which a public employee has prevailed since the extreme case that kicked off the 'class of one' movement more than two decades ago."  424 F.3d at 633 (citing Levenstein v. Salafsky, 414 F.3d 767 (7th Cir. 2004); Hedrich v. Board of Regents, 274 F. 3d 1174 (7th Cir. 2001); Staples v. City of Milwaukee, 142 F.3d 383 (7th Cir. 1998); Orr v. City of Albuquerque, 417 F.3d 1144, 1150 n. 6 (10th Cir. 2005); Neilson v. D'Angelis, 409 F.3d 100, 106 (2d Cir. 2005); Campagna v. Massachusetts Dept. of Environmental Protection, 334 F.3d 150, 156 (1st Cir. 2003)).  That case was Ciechon v. Chicago, 686 F.2d 511 (7th Cir. 1982), where a paramedic was made a scapegoat for conduct that had drawn the wrath of the local media, while her identically situated partner received no disciplinary sanction at all.  Ciechon was charged with failure to perform her duties,

_____

[1] As the Tenth Circuit noted in Jennings v. City of Stillwater, 383 F.3d 1199, 1210-11 (10th Cir. 2004): "In the wake of Olech, the lower courts have struggled to define the contours of class-of-one cases.  All have recognized that, unless carefully circumscribed, the concept of a class-of-one equal protection claim could effectively provide a federal cause of action for review of almost every executive and administrative decision made by state actors."

and terminated.  Id. at 522.  Since the city did not proffer any rational reason for the difference in

treatment of the two paramedics, and the treatment was intentional, the court agreed that

Ciechon's equal protection rights had been violated.  Id.

This court has twice considered the application of a "class of one" theory outside the

regulatory context.  In Cain v. Tigard-Tualatin School Dist. 23J, 262 F.Supp.2d 1120 (D. Or.

2003), Chief Judge Haggerty declined to extend the "class of one" theory to a claim of isolated

harassment by a football coach against a high school student.  The court reasoned that the

Supreme Court in Olech "surely would have spoken more clearly" if it had intended to extend

the reach of the Equal Protection Clause from protection from discriminatory behavior by city

officials in a regulatory context to all instances of  arbitrary state action.  Cain, 262 F. Supp. 2d

at 1130.  "Such a reading," wrote Judge Haggerty, "would grant relief to any public employee or

student who was 'singled out' by a state official," which would extend equal protection "well

beyond the limits of the Fourteenth Amendment."  Id.  Although the plaintiffs in Cain alleged

equal protection and due process claims, their case was rooted in First Amendment retaliation,

not workplace retaliation.

In an unpublished decision, Magistrate Judge Ashmanskas distinguished Cain to deny a

defense motion for summary judgment premised on the same argument defendant makes in the

instant case.  Engquist v. Oregon Dep't. of Agric., 2004 WL 2066748 (D. Or. 2004).  He found

the Supreme Court's language in Olech to be "broad and propounds no intention to limit the

holding in the manner suggested by defendants."  Id. at 4.  Instead, he relied on Ciechon, and

Ziegler v. Jackson, 638 F.2d 776 (5th Cir. 1981), as examples of cases where plaintiffs prevailed

on a "class of one" theory against their employers, who were unable to proffer a rational basis for

adverse employment decisions.  In Ziegler, the Alabama Peace Officer Standards and Training

Commission was found to have violated plaintiff's equal protection rights when it failed to offer

a rational justification for retraining three employees following criminal convictions, but

refusing to retrain plaintiff after his criminal conviction.  Judge Ashmanskas also cited Bartell v.

Aurora Pub. Schs., 263 F.3d 1143, 1149 (10th Cir. 2001), in which a former school district

employee failed to establish that the school district selectively enforced its policies when it

launched an investigation of sexual harassment charges against him.

In sum, the body of case law on the "class of one" theory does not preclude a § 1983

plaintiff from attempting to show that she was singled out in the workplace and thereby denied

her right to equal protection.  However, to survive summary judgment on this theory a plaintiff

must meet the burden of showing she was similarly situated to others, but intentionally treated

differently, see Drake v. City of Fort Collins, 927 F.2d 1156, 1162 (10th Cir. 1991)(plaintiff

must prove defendant was motivated by a discriminatory purpose to deprive her of equal

protection), and also "negative any reasonably conceivable state of facts that could provide a

rational basis for the [alleged unequal treatment]." Lauth, 424 F.3d at 633.  This, Engelbrech

simply cannot do.

### ii.    Similarly Situated

The parties dispute whether Engelbrecht is similarly situated to Kristina McNiece, Anna

Jones and Jody Karlik, the other three women who bumped into the Eligibility Unit.

Engelbrecht contends she was identical to the other three "in all critical respects," including that

she bumped into the Eligibility Unit at the same time they did, and that they all were subjected to

hostile treatment initially.  However, according to the County, there were too many differences

between these women to find them "prima facie identical" to Engelbrecht.  The County points

out that, among the differences, Engelbrecht was the only employee who filed a grievance.

Therefore, according to the County, Engelbrecht cannot show, as she must, that the County

responded to the other women's complaints but exhibited deliberate indifference to her

complaints.

The Equal Protection Clause does not forbid classifications.  It simply keeps

governmental decisionmakers from treating differently persons who are "similarly situated" or

"in all relevant respects alike."  Nordinger v. Hahn, 505 U.S. 1, 10 (1992).  In a "class of one"

claim, the smaller and more vulnerable the class, the more carefully the classification should be

scrutinized.  SeaRiver Mar. Fin. Holdings, Inc. v. Mineta, 309 F.3d 662, 679 (9th Cir. 2002).

Thus, the standard for determining whether another person's circumstances are similar to the

plaintiff's must be whether they are "prima facie identical."  Neilson v. D'Angelis, 409 F.3d 100,

106 (2nd Cir. 2005).  "General similarity" will not suffice.  Id.

In Neilson, a New York court security officer brought a § 1983, equal protection claim

alleging that as a "class of one" he had been singled out for differential treatment when he was

disciplined for unholstering his gun during a nighttime encounter with cleaning staff in the

courthouse, by comparing his discipline to lesser sanctions imposed on other court officers in

connection with other allegedly similar incidents.  Id. at 102.  The Second Circuit reversed the

district court's denial of the defendant's judgment as a matter of law, following a jury verdict in

favor of plaintiff, finding the plaintiff had not met the test for similarity.  The Court found the

plaintiff's comparisons to one officer who had reported to work intoxicated at a firing range for

his annual weapon requalification, and another who had engaged in the unauthorized use of a

co-worker's credit card number to place six telephone calls from the Long Island City courthouse to a phone sex line, charging a total of $360.62, did not pose the same degree of potential danger as plaintiff's act of unholstering his gun.  Id. at 103, 106.  Further, the two other officers immediately admitted their wrongdoing and voluntarily accepted the consequences of their actions, whereas the plaintiff falsely reported his incident and thereby triggered the disciplinary process that was the basis of his claim.  Id. at 106.

Similarly, in Campagna, 334 F.3d at 156, the court found that the plaintiff failed to show he was similarly situated to the two employees he claimed were treated differently.  In that case a state Department of Environmental Protection (DEP) employee alleged retaliation for suing his employer for failing to give him preferential hiring as a Vietnam Vet, and for advocating, pursuant to his private side-business, that a homeowner's septic system be reevaluated after an inspector with DEP cited the homeowner for non-compliance.  The court determined that the plaintiff was not similar to the other two inspectors who cited the homeowner for non-compliance because DEP disagreed with the plaintiff's groundwater opinion while it agreed with the other two employees' opinions, suggesting the other two did their work completely but the plaintiff did not.  Further, the plaintiff had rendered his groundwater opinion in the course of running his private business, while the other two had inspected the property on behalf of DEP. Id. at 127.

Only Ciechon, 686 F.2d at 522, the flagship case for "class of one" equal protection claims, provides an example of a court agreeing that a plaintiff was similarly situated to those she claimed were treated differently.  In that case a paramedic was discharged for failure to perform her duties after an elderly man with one lung died following the paramedics' refusal to

administer oxygen to him in his home, and his refusal to be transported to the hospital.  The
Seventh Circuit agreed with the district court that the plaintiff was similarly situated to the other
paramedic on duty with her that day because they were "equally responsible for the welfare of
the patient on all ambulance runs" and they "experienced the same set of circumstances and were
equally responsible for patient assessment and treatment."  Id.

Here, Engelbrecht claims she was similarly situated to Kristina McNiece, Anna Jones,
and Jody Karlik because all four women bumped into the Eligiblity Unit in March and April
2003, and were "in identical positions in all critical respects."  Pl. Memo. at 22.  Engelbrecht
argues that although Jones was in the Non-Services Eligibility Unit, and reported to a different
supervisor, while the others were in the Services Eligibility Unit and reported to Ordway, "all
were eligibility specialists and had the same job classification and basic functions."  Id. at 23.
This court does not agree.

Kristina McNiece bumped into the Eligibility Unit from the Energy Assistance Program,
not from the Information and Referral unit, as did Engelbrecht.  In addition to coming to the unit
with different experience, McNiece completed state training once in the unit, whereas
Engelbrecht did not.  Unlike Engelbrecht, who requested a flex schedule in order to take classes,
McNiece requested a flex schedule to accommodate prenatal care appointments.  Additionally,
while McNiece had been absent from work like Engelbrecht, McNiece's absences at the time she
was granted a flex schedule were associated with prenatal care and medical appointments for her
ill husband, whereas the reason for Engelbrecht's absences at the time she requested a flex
schedule are not apparent from the evidence.  Engelbrecht contends the reason for her absences
was irrelevant because Ordway perceived her and McNiece as similarly situated.  Yet no
evidence supports this contention.  Even if Ordway had perceived them as similarly situated, the

fact remains that they were not, and as a result the County can point to a rational reason for denying Engelbrecht a flex schedule while granting a flex schedule to McNiece.

Anna Jones bumped into the Non-Eligibility Unit from Licensing. In addition to having different experience than Engelbrecht, she held a different position and had a different supervisor. Unlike Engelbrecht, Jones also completed state training. The record does not indicate whether Jones had a good attendance record.

Jody Karlik bumped into the Eligibility Unit from the Developmental Disability Program, and she continued to carry a developmental disability caseload while working for the Eligibility Unit. She also completed her state training. The record does not indicate whether Karlik had a good attendance record.

In sum, Engelbrecht has failed to show that she shared the exact same responsibilities as McNiece, Jones and Karlick, that her work product and attendance record were the same as theirs, or that she was as qualified as McNiece to receive a flex schedule. To the contrary, the record indicates that while all four women may have shared the title "Eligibility Specialist," they each had different types of caseloads. Further, the record is not clear about how Engelbrecht's spotty attendance compared to the others. In light of the careful scrutiny that must be applied to a "class of one" claim when comparing Engelbrecht to others who were allegedly treated differently, this court cannot say that Engelbrecht is prima facie identical to McNiece, Jones or Karlik.

### iii.    Rational Basis for Alleged Unequal Treatment

Engelbrecht has also failed to "negative any reasonably conceivable state of facts that could provide a rational basis for the [alleged unequal treatment]." Lauth, 424 F.3d at 633

(internal citations omitted).  The same factors that distinguish Engelbrecht from McNeice, Jones and Karlik -- experience, caseload, attendance record, and state training -- provide a plausible explanation for why she was not granted a flex schedule upon bumping into the Eligibility Unit or allowed to move her work station to a different floor.

The County's Motion for Summary Judgment should be granted as to the § 1983 claim because Engelbrecht has not established that she was similarly situated to others who were treated differently and because she has failed to show that the County could not provide a rational basis for the alleged unequal treatment.

### B.    Policy, Custom, or Act of Final Policymaker

Even if Engelbrecht could establish a prima facie equal protection violation based on the "class of one" theory, she cannot prove municipal liability.  To establish municipal liability Engelbrecht must show that her injury is attributable to (1) an express policy of the County; (2) a County custom or widespread practice, not authorized by written law, but so permanent and well settled that it has the force of law; (3) the act of a final County policymaker; or (4) ratification of a subordinate's actions, and the basis for them, by a final County policymaker.  See Lytle v. Carl, 382 F.3d 978, 982 (9th Cir. 2004); see also Board of County Comm'r v. Brown, 520 U.S. 397, 403 (1997) ("a municipality may not be held liable under § 1983 solely because it employs a tortfeasor"); see generally City of St. Louis v. Praprotnick, 485 U.S. 112 (1988).

Engelbrecht does not argue that she was treated unequally pursuant to an express policy of the County.  Rather, she claims her injury is attributable to a County custom, or the act of a *de facto* County policymaker.

### i.    Final Policymaker

Even if Ordway and Mullin were not technically final policymakers, Engelbrecht argues they were *de facto* policymakers because "all levels of management were involved in the review and denial or her grievance, including the designee of the Board of County Commissioners," such that their treatment of Engelbrecht was ratified by final policymakers.  The County claims Engelbrecht has not shown that an authorized County policymaker knew her constitutional rights were being violated and made a "deliberate" or "conscious choice" not to do anything about it, or that an authorized County policymaker "ratified" the alleged unconstitutional conduct by approving "a subordinate's decision and the basis for it."  Praprotnik, 485 U.S. at 127.

To determine whether an official is a final policymaker, "courts consider whether an official's discretionary decisions are 'constrained by policies not of that official's making' and whether the official's decisions are 'subject to review by the municipality's authorized policymakers.'"  Christie v. Iopa, 176 F.3d 1231, 1235, 1236-38 (9th Cir.), cert. denied, 528 U.S. 928 (1999)(quoting Praprotnik, 485 U.S. at 127).  For this determination, we look to the way a local government entity operates in practice.  Jett v. Dallas Independent School District, 491 U.S. 701, 737 (1989).  While authority to make municipal policy may be granted directly by legislative enactment, it may also be "delegated by an official who possesses such authority." See Lytle, 382 F.3d at 983-85 (affirming a district court's finding that a school superintendent was a final policymaker where the school district, pursuant to Nevada law, explicitly delegated full authority over employee discipline to him).  However, "[t]he fact that a particular official -- even a policy-making official -- has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on the exercise of that discretion."  Gillette v. Delmore, 979 F.2d 1342, 1349 (9th Cir. 1992) (citing Pembaur v. Cincinnati, 475 U.S. 469, 481-

82 (1986)); see also Christie, 176 F.3d at 1235, 1236-38 (delegation of discretion to act on day-to-day matters does not constitute a delegation of final policymaking authority).

In City of St. Louis v. Praprotnik, Justice O'Connor, writing for a plurality, reinforced the principle articulated in Pembaur that state law will be used to determine policymaking status. 485 U.S. at 124.  The Court in Praprotnik also underscored the importance of "finality" to the concept of policymaking and reiterated the distinction set out in Pembaur between authority to make final policy and authority to make discretionary decisions.  Praprotnik, 485 U.S. at 127. The Court held, "[w]hen an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality."  Id. at 127.  The Court stated that for a subordinate's decision to be attributable to the government entity, "the authorized policymakers [must] approve [the] decision and the basis for it.  Simply going along with discretionary decisions made by one's subordinates . . . is not a delegation to them of authority to make policy."  Id. at 129–30.

Here, under Or. Rev. Stat. §§ 203.010-203.035, the Clackamas County Board of Commissioners (the "Board") is the authorized final policymaker for the County, and its official policy on employment does not authorize or permit retaliation or harassment of employees for the exercise of union rights or any other protected rights.  See Clackamas County Code Section 2.02.010 et seq.  Even though the Board did not expressly delegate final policymaking authority to Fisher-Davidson, Mullin, or Ordway, Engelbrecht contends all three had final policymaking authority.  She argues that Ordway had final discretion on decisions involving employee training and assignment of a flex schedule, Mullin had final discretion regarding whether to discipline supervisors, and Fischer-Davidson was the final arbiter of employment-related disputes.

Page 23 - FINDINGS AND RECOMMENDATION/ORDER

This court does not agree with Engelbrecht.  She has proffered no evidence that Ordway, Mullin, Fischer-Davidson, or even Nancy Drury, the Director of the Department of Employee Services who ultimately denied her grievance, were authorized to set municipal policy.  Nor has she shown that their decisions were final and not subject to review by anyone in the County. The grievance process, which Engelbrecht took advantage of, demonstrates that Ordway and Mullin and Fischer-Davidson's decisions were indeed subject to review.

Even assuming, *arguendo*, that Drury's decisions were not subject to review, Engelbrecht has not shown Drury knew Engelbrecht's constitutional rights were being violated, or that Drury made a deliberate choice to allow the violation to continue.  Engelbrecht's grievance did not allege constitutional violations; it claimed that she was retaliated against for exercising her right under the collective bargaining agreement to bump into her job in the Eligibility Unit.

In Gillette v. Delmore, 979 F.2d 1342 (9th Cir. 1992), the Ninth Circuit reversed the district court's denial of defendant's motion for judgment notwithstanding the verdict on the basis that plaintiff failed to establish that the City Manager made final policy when he declined to overrule a fire chief's decision to terminate a firefighter.  The Court held that the fact the City Manager did not overrule the fire chief's decision was not enough to show that he made a "deliberate choice from among various alternatives" to follow a particular course, as required by Pembaur.  Gillette, 979 F.2d. at 1348.  The Court further noted that under Praprotnick, before a policymaker will be deemed to have ratified a subordinate's discretionary decision he must approve the decision, and the basis for it.  Gillette, 979 F.2d. at 1348.

Similarly, in this case there is no evidence that anyone with final County policymaking authority made a deliberate choice among various alternatives to approve the allegedly unequal

treatment of Engelbrecht by Ordway, or the basis for it.

///

### ii.    Custom

Engelbrecht contends it was the County's custom to permit supervisors such as Ordway to make "certain decisions regarding the operation of their work units" without the approval of final policymakers.  Engelbrecht impliedly argues that Ordway's exercise of her discretion was tantamount to a custom of singling Engelbrecht out to deny her right to equal protection. According to Engelbrecht, Ordway's practice of refusing to properly train her, denying her a flex schedule, failing to maintain a safe working environment, failing to take effective action to stop her coworkers from harassing her, and harassing Engelbrecht herself, amounted to a County custom.

The County argues that alleged disparate treatment of one person cannot be so widespread as to constitute a custom, and in any event, Engelbrecht has not shown that the Board of County Commissioners -- the final policymaker for the County -- consciously or deliberately pursued a policy of inaction, delegated final policymaking authority to Ordway or Mullin, or ratified Ordway or Mullin's actions.

A "custom" is a practice so "permanent and well-settled" and "persistent and widespread" that policy-making officials (not just lower-level employees) can be said to have either actual or constructive knowledge of it.  Monell, 436 U.S. at 691; see also Gates v. Unified School Dist. No 449 of Leavenworth County, Kan., 996 F.2d 1035, 1041 (10th Cir. 1993).  Under Monell, government liability attaches when the constitutional injury results from the implementation or "execution of a government's policy or custom, whether made by its lawmakers or by those

Page 25 - FINDINGS AND RECOMMENDATION/ORDER

whose edicts or acts may fairly be said to represent official policy."

///

   Engelbrecht has not met this standard.  First, she cannot show that Ordway's alleged practice was "permanent and well-settled."  To the contrary, Engelbrecht alleges that she was singled out for unique treatment for approximately six months, beginning in July 2003 and lasting until she resigned in December 2003, during which time Engelbrecht was frequently absent and took an unspecified period of medical leave.  Engelbrecht has not cited any authority, nor has this court located any, in support of finding a "custom" where the alleged practice lasted less than six months and related to only one employee.  Cf. Christie, 176 F.3d at 1235, 1236-38 (plaintiffs failed to establish longstanding practice where they alleged that a county official singled them out for unique treatment); see also Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996) ("Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy."); Thompson v. City of Los Angeles, 885 F.2d 1439, 1443-44 (9th Cir.1989) ("Consistent with the commonly understood meaning of custom, proof of random acts or isolated events [is] insufficient to establish custom.").

   Second, Engelbrecht has not shown that the alleged unequal treatment visited upon her was the act of a final County policymaker, or that a final County policymaker was on notice of a widespread and persistent custom of retaliation against her for exercising her bumping rights and ratified both the custom and the basis for it.

   According to Engelbrecht, her grievance put John Mullin, Director of the Social Services

Division, and upper-management in general, on notice of Ordway's practice, yet Mullin intentionally put on "blinders" to it, deciding instead to view Engelbrecht's allegations as isolated incidences of negativity in the Eligibility Unit.  Engelbrecht argues that in response to her grievance Mullin or upper-management should have investigated whether Engelbrecht's working environment was hostile.

Not only has Engelbrecht failed to establish that Ordway, Mullin, or any other person involved in the review of her grievance was a final County policymaker, her grievance did not allege constitutional violations; it claimed that she was retaliated against for exercising her right under the collective bargaining agreement to bump into her job in the Eligibility Unit.  Rather than turning a blind eye to Engelbrecht's allegations, Mullin agreed with Engelbrecht that her rights under Article XI of the collective bargaining agreement had been violated by Ordway's comments in the break room, and he told Ordway she was not to discuss work-related matters in that setting.  Although Mullin disagreed that Article XV had been violated (because Ordway's comments did not relate to discrimination based on age, sex, disability, marital status, race, color, creed, national origin, or political affiliation), his opinion did not constitute ratification of Ordway's behavior, or deliberate indifference to Engelbrecht's allegations.  He simply did not agree with Engelbrecht that Ordway's comments amounted to discrimination based on one of the protected categories under the agreement.

Further, even assuming, *arguendo*, that the County should have viewed Engelbrecht's grievance in the broadest possible light and investigated whether her work environment was hostile, the County's cannot be held liable under a "custom" theory for failing to act on a single grievance because one grievance does not put officials on notice of a widespread and persistent custom.  See Andrews v. Fowler, 98 F.3d 1069, 1075-76 (8th Cir. 1996)(city was not liable for

failure to act on, or investigate, prior complaints of sexual abuse by police officers unless the complaints were widespread and persistent, and prior similar complaints were ignored).

Based on the foregoing, the County's Motion for Summary Judgment at to the § 1983 claim should also be granted because Engelbrecht has not adduced facts sufficient to establish municipal liability.

## II.   <u>Common Law Wrongful Discharge</u>

Engelbrecht alleges in her second claim for relief that she was intentionally subjected to a hostile work environment by the County in retaliation for exercising her contract  right to bump into the Eligibility Unit and that the hostile work environment resulted in a constructive wrongful discharge in violation of Oregon common law.  The County moves for summary judgment arguing that: (1) a wrongful discharge claim is preempted by the remedies available under

§ 1983; (2) Engelbrecht's claim of retaliation for exercising her contractual right to bump into the Eligibility Unit does not, as a matter of law, support a common law wrongful discharge claim; and (3) Engelbrecht fails to make out a prima facie case of constructive discharge.  In the alternative, if the court grants summary judgment on the § 1983 claim, the County asks the court to decline to exercise jurisdiction over the state claim pursuant to 28 U.S.C. § 1367(c).  Under these circumstances, the court should decline jurisdiction of the state law claim.

A federal court has discretion whether to grant supplemental jurisdiction over pendent state claims or to dismiss them.  <u>See</u> 28 U.S.C. § 1367(c).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine -- judicial economy, convenience, fairness, and comity -- will point

Page 28 - FINDINGS AND RECOMMENDATION/ORDER

toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie-Mellon University v. Cahill, 484 U.S. 343, 350 n. 7 (1988).  In this case, the balance of factors favors allowing the state court to resolve whether Engelbrecht can proceed to trial on her wrongful discharge claim.  In addition to having concerns about the viability of Engelbrecht's constructive wrongful discharge claim in light of the arguments advanced by the County, the court also notes that under Oregon law, the existence of an employment contract or collective bargaining agreement does not necessarily foreclose an employee from bringing a claim for common law wrongful discharge.  However, in such cases, courts "must inquire whether the remedies provided by the contract adequately redress the alleged injury." Dunwoody v. Handskill Corporation, 185 Or. App. 605, 614, 60 P.3d 1135, 1141 (2003).  That issue was not addressed by the parties in summary judgment briefing.  The County's substantive summary judgment arguments and the issue of whether the plaintiff has a viable wrongful discharge claim in light of her collective bargaining agreement, all raise important questions of Oregon law and public policy.[2]  Accordingly, judicial efficiency is not compromised by foregoing ruling on this claim and considerations of comity favor allowing the state court to hear this matter if the parties choose to pursue it.

Based on the foregoing, this court should decline supplemental jurisdiction and instead dismiss the remaining state law claim without prejudice pursuant to 28 U.S.C. § 1367(c).

### RECOMMENDATION

---

[2]For example, Oregon courts have identified two circumstances that support a claim for common law wrongful discharge: (1) discharge for exercising a job-related right of important public interest; and (2) discharge for complying with a public duty.  See Draper v. Astoria School Dist. No. 1C, 995 F.Supp. 1122, 1127 (D. Or. 1998).  A serious question exists about whether exercising a private contractual right can fit into one of these exceptions.

Page 29 - FINDINGS AND RECOMMENDATION/ORDER

This court recognizes that the Ninth Circuit has set a high standard for granting summary judgment in employment discrimination cases. <u>See</u> <u>Schindrig v. Columbia Machine, Inc.</u>, 80 F.3d 1406, 1410 (9th Cir.), <u>cert. denied</u>, 519 U.S. 927 (1996).  However, a scintilla of evidence, or evidence that is merely colorable or not significantly probative, does not present a genuine issue of material fact.  <u>United Steelworkers of America v. Phelps Dodge Corp.</u>, 865 F.2d 1539, 1542 (9th Cir.), <u>cert. denied</u>, 493 U.S. 809 (1989).

For the foregoing reasons, the County's Motion for Summary Judgment (No. 37) should be granted as to Engelbrecht's § 1983 claim, and her wrongful discharge claim should be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c). The County's Motion to Strike (No. 60) is denied as moot.  A judgment should be prepared dismissing the § 1983 claim with prejudice and dismissing the wrongful discharge claim without prejudice to refiling in state court.

### SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review.  Objections, if any, are due August 7, 2006 .  If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.  If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.


Dated this 24st day of July, 2006.

/s/ Paul Papak_____
Honorable Paul Papak
United States Magistrate Judge


Page 30 - FINDINGS AND RECOMMENDATION/ORDER